# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 18, 2015 Session

## STATE OF TENNESSEE v. ANTHONY PORRAZZO

**Appeal from the Criminal Court for Knox County**
**No. 100242     Steven R. Sword, Judge**

---

**No. E2014-02335-CCA-R3-CD – Filed December 17, 2015**

---

The defendant, Anthony Porrazzo, appeals his Knox County Criminal Court jury convictions of aggravated robbery and misdemeanor theft, contending that the trial court erred by refusing to suppress the statements he made to law enforcement officers, that the trial court abused its discretion by excluding certain witness testimony and by denying the defendant's motion for a mistrial, and that the evidence adduced at trial was insufficient to support his convictions. Discerning no reversible error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Jonathan Harwell (on appeal), Julia Auer Gautreau (on appeal and at trial), and Robert C. Edwards (at trial), Assistant District Public Defenders, for the appellant, Anthony Porrazzo.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Charme Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In September 2012, the Knox County Criminal Court grand jury charged the defendant with four counts of aggravated robbery accomplished by violence and four counts of aggravated robbery accomplished by placing the victims in fear, all arising out of three separate incidents. The trial court conducted a jury trial in May 2013.

The State's proof at trial showed that, on July 7, 2012, Millie Muchenburg was operating the cash register at a CVS pharmacy on Asheville Highway when a man gave her a five dollar bill to pay for a package of chewing gum. When Ms. Muchenburg opened the cash drawer, the man said, "'Ma'am, I hate to do this to you,'" and Ms. Muchenburg noticed that the man was holding a handgun on the counter. The man asked her to give him all of the register's cash, and when Ms. Muchenburg complied, he fled from the store. Ms. Munchenburg then notified her manager of the robbery and called 9-1-1.

Around 2:00 p.m. that same day, Lindsey Dergosits and Sherry Cloud were working at the Kenjo Market on Broadway when a man appoached their cash registers with a gun. Ms. Cloud recalled that the man said, "'This is a stick up. Give me all your money.'" Ms. Dergosits testified that the sight of the gun "made [her] very nervous," and Ms. Cloud stated that the gun "made [her] angry . . . [b]ecause everybody else . . . has to work for a living." Both women placed the cash on the counter, and the man grabbed the money before fleeing. Ms. Cloud followed the man to the door and watched him run toward the rear of the building, and Ms. Dergosits called 9-1-1. Ms. Cloud then saw a Comcast truck "that had sped out from behind the store and turned left and went down toward Grainger." Ms. Dergosits testified that the man stole $78 from her "because [she] had just counted the drawer," and Ms. Cloud estimated that the man stole approximately $200 from her register.

Tanya Trujillo, an assistant manager at the Subway restaurant on Asheville Highway, testified that she was working on July 7 when a man entered the restaurant, produced a handgun, and announced, "'This is a robbery. Give me all your money.'" Ms. Trujillo observed that the gun was "cocked back" and "wasn't loaded," but she was still "a little nervous" because the robber "could have jumped across the counter and hit [her] in the head" with the gun. Per her training, Ms. Trujillo gave him all of the money from the cash register, and the man ran out of the restaurant. After reviewing surveillance video from the restaurant's interior, Ms. Trujillo noticed what appeared to be a white Comcast truck drive past the restaurant while she was making a sandwich for another customer and prior to the robber's entry into the restaurant. Ms. Trujillo testified that the robber ran in the direction of the white truck when he fled from the restaurant. Through the testimony of Ms. Trujillo, the State introduced into evidence surveillance video footage which comfirmed her observations. Ms. Trujillo recalled that the robber stole over $200.

Knoxville Police Department ("KPD") Detective A.J. Loeffler with the violent crimes unit reported for work on the afternoon of July 7 and began investigating the robberies that had occurred that day. KPD officers located the Comcast truck at issue at 3434 Linden Avenue, and when Detective Loeffler arrived on the scene, both the

defendant and Justin Plummer were present; both men were arrested and transported to the police station. Detective Loeffler also observed "a bundle of money" at the scene "in the ballpark [of] $400," as well as money wrappers and a handgun.

Detective Loeffler returned to the police station and provided the defendant with *Miranda*[1] warnings. The defendant signed a waiver of his rights and agreed to speak with Detective Loeffler. A video recording of the defendant's interview was admitted into evidence and played for the jury. On the recording, the defendant explained that he was an employee of a Comcast subcontractor; that he had met Mr. Plummer on the morning of July 7 while purchasing crack cocaine on Linden Avenue; that he had agreed to drive Mr. Plummer on a number of errands; and that, while on those errands, Mr. Plummer had robbed three establishments. The defendant denied knowing that Mr. Plummer intended to rob the first two establishments, although he admitted that he knew Mr. Plummer planned to commit a robbery at the Subway location and that Mr. Plummer had a handgun.

On cross-examination, Detective Loeffler acknowledged that the defendant had mentioned during the interview that he had not slept at all the previous night and that he had been using crack cocaine throughout the day. Detective Loeffler also admitted that the defendant had described his recall of the events of the day as "'a little shaky.'"

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon* colloquy, the defendant chose to testify and present proof.

The defendant, who was 35 years old at the time of trial, testified that he had graduated from high school in Ohio and had attended college for more than two years but did not have a college degree. In July 2012, the defendant was employed as a telecommunications technician for a Comcast subcontractor.

On the evening of Friday, July 6, and in the early morning hours of July 7, the defendant drove to Linden Avenue on three separate occasions to purchase crack cocaine. By Saturday morning, the defendant realized he would be unable to work that day because he was "mentally exhausted" and "paranoid." Around 9:00 a.m., the defendant returned to Linden Avenue in his Comcast truck hoping that his supplier would "front" him more crack cocaine because, by that time, he was out of money. His supplier was unable to provide any additional drugs, and the defendant, while talking to the supplier, met Mr. Plummer. The defendant recalled seeing Mr. Plummer with a handgun that he was attempting to sell. Mr. Plummer asked the defendant to drive him to a

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

location on East Fifth Avenue. The defendant agreed, and, once there, the two men joined several other people who were using crack cocaine.

After approximately one hour, Mr. Plummer asked the defendant to "give him a ride somewhere." After a brief stop at a Kroger store, Mr. Plummer directed the defendant to drive to the CVS on Asheville Highway. The defendant parked on the side of the store and stayed inside the truck while Mr. Plummer went inside. When Mr. Plummer returned to the truck, the two men returned to the house on East Fifth. While at the house on this occasion, the defendant walked into the kitchen and saw on the table or countertop the same handgun that he had seen in Mr. Plummer's possession earlier in the day. The defendant denied ever seeing the handgun inside his truck and denied that Mr. Plummer ever mentioned having the gun.

A short time later, Mr. Plummer again asked the defendant to give him a ride. After making a few stops, the men arrived at the BP gasoline station.[2] The defendant parked behind the store, explaining that was "where [he] usually parked," and Mr. Plummer headed in the direction of the store. A few minutes later, Mr. Plummer returned to the truck with a sense of urgency, instructing the defendant "to go, go, go." The defendant, suspecting something was wrong, said to Mr. Plummer, "'I don't know what you just did, but you're going to get us in trouble.'" The men then returned to Linden Avenue and consumed more narcotics.

Mr. Plummer again asked the defendant to give him a ride. This time, the men drove to the Subway restaurant, and Mr. Plummer went inside. The defendant denied seeing Mr. Plummer with a handgun, and he denied knowing that Mr. Plummer intended to rob the restaurant. After the men returned to the house on Linden, the defendant saw "money in denominational bands" and "had a pretty good idea" that Mr. Plummer had robbed the restaurant. Approximately one hour later, KPD officers arrived at the house, and both the defendant and Mr. Plummer were arrested.

According to the defendant, he was "heavily intoxicated and also very exhausted" during his interview with Detective Loeffler. The defendant testified that he "really didn't recall a lot of events" and that "near the end of that interview, [he] really, more than anything, just wanted to be out of that interview room." The defendant conceded that he had lied to Detective Loeffler.

Outside the presence of the jury, the defendant sought to introduce the testimony of three character witnesses on the grounds that the State had attacked the defendant's character for truthfulness. The trial court disagreed, finding that it would be

---

[2] The BP gasoline station and the Kenjo Market are one and the same.

inappropriate "to rehabilitate by putting on witnesses to testify to his truthful character now." The trial court did, however, permit the defense to make an offer of proof.

Jeffrey Hunter, a pastor with Focus Prison Ministries and the director of the Exodus Project at the Knox County Detention Facility, testified that the defendant entered his program in September 2012 and spent approximately six months there. Mr. Hunter had daily contact with the defendant during this time period and testified that the defendant "did a good job of telling us what was going on in his life, and how he . . . was remorseful for some things, and how he wanted to be truthful with us." Mr. Hunter believed the defendant to be "very genuine and sincere."

David Elkins, director of Focus Christian Academy, testified that he met the defendant while the defendant was participating in the Exodus Project. Mr. Elkins found the defendant to be "a remorseful and genuine man of character" and stated that he "could count on [the defendant] to always tell [him] the truth."

Ira Wishart, a retired businessman, testified that he met the defendant while volunteering with the Focus Ministries in the fall of 2012. Mr. Wishart stated that he believed the defendant's character for truthfulness to be "impeccable" and that he had "never doubted his truthfulness."

Based on the evidence presented, the jury convicted the defendant, with respect to counts one and two, of the lesser included offenses of misdemeanor theft. With respect to the remaining counts, the jury convicted the defendant as charged of aggravated robbery. The trial court merged all the alternative counts and sentenced the defendant as a standard offender to a term of 11 months, 29 days for the misdemeanor theft conviction and eight years at 85 percent service by operation of law for each of the aggravated robbery convictions. The court ordered all sentences to be served concurrently for a total effective sentence of 8 years.

Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by refusing to suppress the incriminating statements he made to law enforcement officers, by excluding the testimony of the defendant's character witnesses, and by denying the defendant's motion for a mistrial. In addition, the defendant asserts that the evidence adduced at trial was insufficient to support his convictions of theft and aggravated robbery. We will consider each claim in turn.

*I. Motion to Suppress*

The defendant first contends that the trial court erred by denying his motion to suppress the inculpatory statements he provided to law enforcement officers, claiming that the statements were obtained in violation of his constitutional rights. Specifically, the defendant claims that, during the interview following his arrest, he was exhausted and intoxicated and, as such, he was unable to knowingly and voluntarily execute a waiver of his *Miranda* rights. In addition, the defendant claims that his confession was coerced and therefore should have been suppressed on that basis. The State asserts that the trial court did not err by denying the motion and admitting the statements as evidence at trial.

At the hearing on the defendant's motion to suppress his pretrial statements, Detective Loeffler denied that the defendant appeared to be intoxicated and agreed that the defendant was communicative and seemed able to comprehend the detective's questions. Through Detective Loeffler's testimony, the State introduced into evidence a copy of the video recording of the defendant's interview. On cross-examination, Detective Loeffler acknowledged that the defendant told him more than once during the interview that he had "gotten high several times over the past 48 hours" and that he had "been awake that entire time." Detective Loeffler also admitted that he had indicated to the defendant that video surveillance footage from the exterior of the stores had established his presence at the time of the robberies, and he conceded that there were, in fact, no such cameras.

The trial court denied the defendant's motion to suppress, finding that the defendant's "rights waiver was voluntarily and knowingly given." The court made the following findings with respect to the defendant's alleged intoxication:

> The only evidence of intoxication or impairment in this case is the defendant's statements that he had not slept in forty-eight hours and had been using crack cocaine repeatedly prior to his arrest. However, throughout the interview, the defendant seemed completely coherent. His speech was clear. He was able to recite a detailed timeline and description of events. He was not yawning excessively, laying his head on the table, or dozing off. (Although he does lay down in the floor after the interview.)
>
> When the defendant was standing or walking on the video, he did not sway or stagger. He seemed to have complete balance. He was able to read the rights waiver form, initial each statement, and properly sign his name. He

maintained eye contact with the investigator. He responded appropriately to the questions asked. He was able to correct the investigator when he disagreed with him. Although his shirt was soaked, all other appearances of the defendant point to someone who was in complete control of his faculties.

With respect to the defendant's claim of coercion, the trial court made the following findings in determining that the defendant's statement was "not the product of coercion or duress":

> The defendant appears to be a middle-aged male. Although there are no details given regarding his education, he appears to be intelligent and maintains employment as a technical contractor with a major cable company. His use of the English language and speech indicate that he has some degree of education. It is unclear if he has any prior experience with the judicial system. The length of the single interrogation was brief. Although he had to wait for some time before the start of the interview, the delay was not excessive. He had not been incarcerated prior to being brought to the station for an interview or brought to the magistrate. The investigator gave a clear oral and written explanation of the defendant's rights prior to the interrogation.

> As stated above, the defendant said he had been using crack cocaine recently and had not slept in forty-eight hours. However, his demeanor on the video did not appear to be someone who was under the influence of a substance or was in a state of sleep deprivation. The officer did not threaten or yell at the defendant at any point in the interview. To the contrary, he was polite and straight-forward.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn.

1998).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment). This means that, to pass federal constitutional muster and be admissible at trial, a confession must be free and voluntary and not "'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence'" or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citation omitted). The rule is equally applicable to confessions given during custodial interrogations following appropriate provision of *Miranda* warnings, *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991). To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined – a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn. 1994)); *see also State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Smith*, 933 S.W.2d at 455-56 (quoting *Kelly*, 603 S.W.2d at 728 (internal citation and quotation marks omitted)).[3] With respect to a defendant's impairment, "intoxication does not render a confession invalid if the evidence shows that the defendant was capable of understanding and waiving his rights." *State v. James David Johnson*, No. W2006-01842-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Jackson, Feb.

---

[3] This test is exactly the same as that promulgated in *Rogers v. Richmond*, 365 U.S. 534, 544 (1961), so it is not entirely clear that it actually effectuates the stated goal of providing more protection to the criminally accused.

6, 2008) (citing *State v. Bell*, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985)).

Upon our review, we conclude that the record does not support the defendant's claim that his statement was involuntarily given or was the result of police coercion. The 34-year-old defendant, who possessed a high school degree and had completed about two years of college courses, was provided with *Miranda* warnings and signed a waiver of his rights. He suffered from no injury or illness during his interview, and he was not abused or deprived of food or sleep during the relatively short interview. Although the defendant claimed to be intoxicated and sleep-deprived, his demeanor and speech belied that contention. His presentation on the video revealed a man who was intelligent, articulate, polite, and alert and who was able to provide very detailed descriptions of his actions that day. Furthermore, nothing indicated that any of the detective's statements could be considered coercive.

The trial court did not err by denying the defendant's motion to suppress his statements.

## II. Exclusion of Character Witnesses

Next, the defendant argues that the trial court erred by excluding the trial testimony of his character witnesses. Because, the defendant contends, the State attacked his character for truthfulness, he was entitled to rehabilitate his credibility.

During the State's case-in-chief, it introduced into evidence, through the testimony of Detective Loeffler, the video recording of the defendant's statement immediately following his arrest. During that interview, the defendant admitted, on more than one occasion, that he knew Mr. Plummer planned to commit a robbery at the Subway location. When the defendant took the stand at trial, he testified that he was not aware that Mr. Plummer intended to rob the Subway restaurant and that he did not know a robbery had taken place until the men returned to the Linden Avenue house and the defendant saw "money in denominational bands." On cross-examination, when the defendant was confronted with the inconsistencies in his testimony, he admitted that he had lied to Detective Loeffler during his initial interview.

At the conclusion of the defendant's testimony and outside the presence of the jury, the defense sought to call three character witnesses to rehabilitate the defendant's character for truthfulness, on the basis that the State had attacked the defendant's credibility on cross-examination. After extensive argument, the trial court ruled that such character witness testimony would be inappropriate because the defendant's character for truthfulness had not, in fact, been attacked. At the request of the defense, however, the trial court did permit the defendant to call the witnesses outside

of the jury's presence to make an offer of proof. The three witnesses, all of whom were involved with Focus Prison Ministries in some capacity, testified that they had met the defendant since his arrest and subsequent incarceration and that they found him to be truthful.

On appeal, the defendant reiterates his claim that the trial court erred by excluding the testimony of his character witnesses and that this exclusion interfered with his constitutional right to present a defense. We review the trial court's decision to exclude this evidence for an abuse of discretion. *State v. Edison*, 9 S.W.3d 75, 77 (Tenn. 1999); *State v. Jackson*, 52 S.W.3d 661, 669 (Tenn. Crim. App. 2001); *State v. Carroll*, 36 S.W.3d 854, 867 (Tenn. Crim. App. 1999), *perm. app. denied* (Tenn. 2000).

Tennessee Rule of Evidence 608(a) states that a witness's credibility may be attacked or supported by opinion or reputation evidence, provided "(1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of *truthful* character is admissible only after the character of the witness for truthfulness has been attacked." Tenn. R. Evid. 608(a) (emphasis added).

The defendant also argues that the trial court's ruling deprived him of the right to present a defense. Although "[p]rinciples of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony" favorable to his cause, *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000)), that right is not without limits, *see Flood*, 219 S.W.3d at 316 (citing *Chambers*, 410 U.S. at 302). Indeed, the Supreme Court has observed that "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence." *Chambers*, 410 U.S. at 302. "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316 (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Holmes v. South Carolina*, 547 U.S. 319 (2006); *Chambers*, 410 U.S. at 302).

We can comprehend the trial court's reluctance to allow the defendant's proffered evidence; the defendant's claim, in one sense, is that his pretrial statement is in fact *untrue*. Nevertheless, on cross-examination, the State did assail the defendant's credibility by asking him about his prior statement that was inconsistent with his trial testimony. This is a form of witness impeachment authorized by Tennessee Rule of Evidence 613. The import of the attack is that the defendant's *trial testimony* is untrue. We conclude that the Rule 613 impeachment of the defendant as a witness brought his proffered evidence within the aegis of Rule 608(a)(2), and the trial court should have allowed the rehabilitation evidence in the wake of the Rule 613 impeachment.

That said, however, we regard the error as harmless beyond a reasonable doubt. The defendant's pretrial statement was admissible, and was admitted, in the State's case in chief and was before the jury prior to the defendant's testimony. Certainly, by exercising his right to testify, he had the power to contradict the pretrial statement, but its existence as substantive evidence against him was a strong counterweight to any character witness testimony that might have been forthcoming. Furthermore, the evidence against the defendant was very strong, and we are not persuaded that character witness testimony would have had any impact on the result in the case. Accordingly, we afford the defendant no relief on this issue.

### III. Motion for Mistrial

The defendant next contends that the trial court erred by denying his motion for a mistrial. We disagree.

After the jury retired to deliberate, the trial court addressed the parties as follows:

> Okay. Folks, the jury sent out a question along with the verdict forms that said that all their verdict forms read the same, and they said, "Shouldn't [counts] two, four, six, and eight say 'by putting the person in fear'? Ours say 'violence.'" And so I looked at it, and sure enough, we had written "guilty of aggravated robbery by use of violence" on all eight counts, and so I've corrected that now and put "guilty of aggravated robbery by putting the person in fear" to distinguish between the multiple counts, and so that says that on the even number counts. All right. Any questions about that, objections?

Defense counsel immediately requested a mistrial on the basis of "substantial confusion to the jury." The trial court denied the motion, stating that the jury had received a copy of the instructions, which the court had verified were correct, and because the elements of aggravated robbery were listed correctly on the instructions, the court found no "manifest necessity for a mistrial."

The decision to grant or deny a mistrial is entrusted to the sound discretion of the trial court, and this court will disturb the trial court's ruling in this regard only when there has been an abuse of the trial court's discretion. *See State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009). "Normally, a mistrial should be declared only if there is a

manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003) (citing *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)). "'In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'" *Saylor*, 117 S.W.3d at 250 (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The burden of establishing the necessity for mistrial lies with the party seeking it. *Id.*

The defendant has failed to establish that the trial court abused its discretion by refusing to grant a mistrial. The instructions the jurors had in their possession contained a correct statement of the law and elements of the charged crimes; only the verdict forms were in error. The error was caught and corrected before the jury reached its verdict. Nothing indicates that the erroneous verdict forms caused the jury to reach an impartial verdict. *See Williams*, 929 S.W.2d at 388. Accordingly, the trial court's decision to deny the motion for a mistrial did not result in a miscarriage of justice. *See Saylor*, 117 S.W.3d at 250.

## IV. Sufficiency

Finally, the defendant challenges the sufficiency of the convicting evidence, arguing that the State failed to prove the elements of violence and fear and that the State failed to prove that the defendant was criminally responsible for the actions of Mr. Plummer. Again, we disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as

well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, aggravated robbery is "robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a). A deadly weapon is defined as "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or [a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 39-11-106(a)(5).

Moreover, "[a] person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." *Id.* § 39-11-402(2); *see State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999) ("As reflected in this case, criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person."). Under the theory of criminal responsibility, the defendant's presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which the defendant's participation may be inferred. *See State v. Watson*, 227 S.W.3d 622, 639 (Tenn. Crim. App. 2006) (citing *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998)). "No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible." *Id.*

Here, the proof adduced at trial established that the defendant, at the behest of Mr. Plummer, repeatedly drove him to locations which Mr. Plummer proceeded to rob at gunpoint. The defendant admitted during his interview with Detective Loeffler that he was aware that Mr. Plummer intended to rob the Subway restaurant and that he was aware that Mr. Plummer was in possession of a handgun. At three separate locations – the CVS pharmacy, the Kenjo Market, and the Subway restaurant – Mr. Plummer produced a firearm and told the four employees he encountered to give him all of their money. All four employees complied.

With respect to the initial robbery at the CVS pharmacy, the jury found the defendant guilty of the lesser included offense of misdemeanor theft. Without question, the evidence was sufficient to prove that Mr. Plummer committed the offense of theft by stealing cash from Ms. Muchenburg, and, as will be addressed herein, the defendant was criminally responsible for the actions of Mr. Plummer.

Turning to the required elements of violence and placing the victims in fear for the convictions of aggravated robbery, our supreme court has held that "pointing a deadly weapon at the victim constitutes 'violence' as used in the offense of robbery pursuant to Tenn. Code Ann. § 39-13-401." *State v. Allen*, 69 S.W.3d 181, 185 (Tenn. 2002). The defendant advances the position that, because Mr. Plummer did not point the gun "at anyone's head" or otherwise use the gun in a violent manner, the "mere observed presence of a firearm" is insufficient to prove violence. The defendant believes this case to be more analogous to the situation in *State v. Eric Lebron Hale*, in which Mr. Hale was convicted of aggravated robbery by violence when he robbed a cashier by simply "patt[ing] his pocket in a manner that caused [the cashier] to believe that he possessed a weapon." *State v. Eric Lebron Hale*, No. M2011-02138-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App., Nashville, Aug. 31, 2012). This court held that, because Mr. Hale exerted no physical force and did not "point or brandish a weapon at the victim," the evidence was insufficient to establish the required element of violence. *Id.*

The defendant's reliance of *Eric Lebron Hale* is misplaced. As can clearly be seen on the video surveillance recordings admitted into evidence at trial, Mr. Plummer pointed the handgun at all four victims. To be sure, the encounters with each victim were brief, but the gun was unquestionably pointed at the bodies of each one. These actions on the part of Mr. Plummer are vastly different from those of Mr. Hale, who never produced a handgun but acted in a manner intended to give his victim the impression that he possessed one. *Id.* Moreover, our supreme court in *Allen* held that the "pointing [of] a deadly weapon at the victim" is sufficient proof of violence; the court did not specify that the weapon must be pointed at the victim's head. *Allen*, 69 S.W.3d at 185. The evidence in the instant case was sufficient to establish that Mr. Plummer committed the crimes of aggravated robbery by violence.

With respect to the element of placing the victims in fear, our supreme court has held that "the jury's task is to determine from all of the evidence whether the victim was placed in fear by the conduct of a defendant or should have been under the circumstances." *State v. Dotson*, 254 S.W.3d 378, 396 (Tenn. 2008). Here, Ms. Dergosits testified that the sight of the gun made her "very nervous," and Ms. Cloud testified that the gun made her "angry." Ms. Trujillo, who observed the gun to be unloaded, was still "a little nervous" because she was concerned that Mr. Plummer could have used the gun to beat her if she did not comply with his request for money. Given

- 14 -

that Mr. Plummer pointed the gun at all three victims, the jury could certainly have inferred from the victims' testimony and the surrounding circumstances that the victims were placed in fear, and the evidence was therefore sufficient to support the convictions of aggravated robbery on these grounds.

Finally, we find the evidence was sufficient to support the jury's finding that the defendant was criminally responsible for the actions of Mr. Plummer. The defendant drove Mr. Plummer to each of the three establishments that Mr. Plummer robbed. At each establishment, the defendant parked out of sight of the front door and was seen speeding away from the Kenjo Market. The defendant admitted during his initial interview with Detective Loeffler that he was aware that Mr. Plummer intended to rob the Subway restaurant, and he admitted knowing that Mr. Plummer was in possession of a handgun. The defendant's "presence and companionship" with Mr. Plummer both before and after the commission of the crimes permit the inference of the defendant's participation. *Watson*, 227 S.W.3d at 639 (citing *Ball*, 973 S.W.2d at 293). Although the defendant testified at trial that he was unaware that Mr. Plummer had committed any crimes until after the commission of the final robbery, such matters of witness credibility and evidentiary weight are within the exclusive province of the trier of fact, and this court will not reweigh such evidence. *See Dorantes*, 331 S.W.3d at 379.

*Conclusion*

Based on the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE